Now we come to Cornell v. N Wasco County School District 21. Thank you, Judge. Good morning. My name is Steve Bruchetto. I represent the plaintiffs in Cornell v. N Wasco County School District. Your Honors, what I'd like to do this morning is I want to talk about two groups of issues that are raised on appeal. The first is the denial of plaintiff's motion for judgment as a matter of law, and the second is I'm going to group together the three jury instruction issues which we contend the judge erred on. This case involves employees of the Wasco County School District retired, obtained pension benefits, and then pursuant to a policy, continued working. In 2008, the district adopted a policy which precluded these individuals from being considered for jobs in the future, and it's our contention that that policy is unlawful under the ADEA, and specifically is inconsistent with this court's decision in Local 350 v. EEOC. Is there any difference between Local 350 and EEOC in this case? There is a difference, but it's not material. What are those differences? The difference is that in Local 350 v. EEOC, the court stated that all employees who are in this case, all pension recipients will be effectively either 50 or older by virtue of the length of service requirement or the age requirements in the pension. I understand that. What else? I see why you see that as irrelevant, but what else? I don't see that there is a distinction. Is Local 350 a desperate impact case? The Ninth Circuit did not rule on whether it's a desperate impact. But after having looked at it, it seems to me the footnote in Local 350 suggests that one must determine what theories of the case are in order to determine whether to remand or not in accordance with Hazen, and then, because they found it a desperate impact case, they remanded it. The text of the opinion containing that footnote says, on its face... You don't agree with me that that's what the impact of that is? No. All right. Let's go on a little further. Isn't 350 a jury trial? 350 is a finding... Wasn't it a jury trial before it got to the appellate court? I don't believe that's correct. I believe it was a motion for summary judgment. I believe that the trial court granted summary judgment in favor, is my recollection, of the EEOC... My thought is that the district court denied summary judgment, suggesting what you're suggesting, even in a desperate impact case, and then sent it to the jury, and then the jury decided the case. You're correct. I stand corrected. And doesn't that make a difference? I don't think it does. Well, in your arguing that there are questions of fact, or at least I should find, as a matter of law, given what's here, that this is wrong, and yet, in that case, they fought about the very thing you're talking about, and the jury said, no, it isn't. And the Ninth Circuit said, on its face, the policy... The issue of fact, that it wasn't about age, and then the Ninth Circuit said, okay. No, the Ninth Circuit and Local 350... I know what the Ninth Circuit did, but after they found it, it was the jury deciding. I don't understand the distinction you're raising, Judge. Okay. The jury rules against them, and the Ninth Circuit says it violates the law. Seems to me it's identical with our situation. Okay, because then you don't see the difference between desperate impact and desperate treatment. What I was going to say in response to that question is that the text of the opinion says they're determining it discriminates on the face of the policy. That's what they said. That's why the jury determination didn't make a difference to the Ninth Circuit. They did say that the district court should require the plaintiff to plead, and there is that footnote, but the Ninth Circuit found a violation of the ADEA, and they said the policy on its face discriminates. Okay. I mean, that's my point here. The policy on its face, in this case, discriminates. Counsel, how is this any different from, let's say, the military has military recruiters, and the military has a policy that says if you have previously in your life burned a draft card, you may not serve as a military recruiter. Well, I think burning a draft card can have legitimate reasons for not employing a recruiter. Right, but it certainly would be a heavy correlation with age. We haven't had draft cards, I think, since the early Reagan administration. So the only people who could possibly have burned draft cards would be older people. How is that any different than the pensions that appear? Well, I still believe that it is a significant difference because it's true that likely, I mean, I'll accept the argument that since there only existed draft cards, that only somebody who's over 40 or 50 could burn one, but there can be legitimate reasons arising from that that are non-age-based for turning someone down for the military, and that is just very simply that the act of burning the draft card could infer that the individual doesn't follow along. There's nothing about this situation like that. But we had a jury trial here, and the jury found that the decision was not based on age. Correct. And I think that I bear a steeper burden climbing the ladder in this case, because nevertheless, we think the ladder has been climbed. There is no non-age-related reason for a restriction on hiring. Well, certainly I could say someone, you know, there's all this talk about pension reform, and they don't want people so-called double-dipping, getting full retirement and then continuing to work. Isn't that a legitimate reason? I don't think it is. Well, can't the legislature make that call? And if the decision here was based on the decision to avoid double-dipping as opposed to age under the Kentucky case in the Supreme Court? The legislature didn't make that decision. The legislature set out rules for the operation of the pension plan, and the point here is this went beyond those rules and disadvantaged folks for being pension recipients. Well, but that goes to disparate impact, which I don't believe you're arguing in this case, correct? I don't believe that's correct. When we moved for judgment as a matter of law, the disparate impact issue was raised. We argued to the court, this is improper under a facial discrimination. It's improper under Kentucky retirement systems as disparate treatment. It's improper under disparate impact. The judge ruled that to the extent that we had raised Local 350 in the case to the extent that 350 was a disparate impact case, the court would consider that. So that theory was raised. The court said we will not go beyond Local 350 in looking at disparate impact to, you know, some more broader argument. But Local 350 was in the case from the motions for summary judgment, and everybody knew about it. And we argued that whether you look at it as disparate impact, discrimination on the face, or disparate treatment, it's an unlawful policy. So it's your position that you argued to that your case was both disparate treatment and disparate impact? Disparate impact at least to the extent that Local 350 is a disparate impact case, yes. Okay, but in terms of arguing to the jury, were there any arguments made to the jury that this was a disparate impact case? There were no arguments to the jury that this was a disparate impact case. Rather, it was an argument to the judge for judgment as a matter of law. Right, but that was never, once he made that ruling, did you ever pursue that theory afterwards? He made that ruling at the end of the trial before instructing the jury. I don't believe that the jury was instructed on a disparate impact claim under Local 350. But still, that doesn't change the issue of we were entitled to judgment as a matter of law before the jury looked at it. How do you deal with the other side is going to get up and they're going to argue the Kentucky case? I'm presuming that's what they're going to say. So give me a preview of why what they're going to say is wrong. What they're going to say is wrong because nothing in Kentucky retirement systems is consistent with Local 350, Local 350 controls. And if you actually go through and apply Kentucky retirement systems, I think it supports our argument. You know, under Kentucky retirement system, the premise of the case is that a retirement plan that lawfully considers age and employers, in context of a retirement plan that lawfully considers age, an employer that makes differences in workers' treatment may do so unless there is sufficient evidence that the decision is actually motivated by age. The court then sends out a process to determine whether it's actually motivated by age. The things that you look at, if you apply them in this case, you come up with the conclusion that on its face, the policy actually is motivated by age. It only affects older individuals. It can't be based upon what's in the retirement plan because the retirement plan says that individuals can choose to return to work. When, after you're done, I don't want to take up your time now, but if you could tell us, where in your opening brief to this court you argued this would impact, that would be great. I will tell you right now, it's argued in the citation to Local 350 as controlling this case. But, okay, so you cited a case, but you never actually in the brief said. I don't believe in the brief it's argued as a particular theory. Rather, we did, we argued that Local 350 contains a finding of a violation of 623 of the ADEA. It makes no reference to whether that finding is based on anything other than the face of the policy. Application of that to the case at bar means the policy is unlawful. If the plaintiffs in Local 350 did not need to specifically advance a disparate impact theory argument, if they didn't need to use those words, why do we here? Well, there's been a lot of water on the bridge since then. The Supreme Court has talked about disparate impact since, you're talking about a case that was 20 years ago. Correct. And the Supreme Court has talked about disparate impact versus disparate treatment. I mean, I see what you're saying, that with that, by citing a case, we should read into the fact that what you were really trying to say was disparate impact. But normally when you're trying to, in ADEA cases, you make it very clear that this case was both disparate impact and disparate treatment. And here's why. I could accept that if there were not a finding of a violation in Local 350. It finds a violation of the ADEA in the opinion. That's what the Ninth Circuit did. And that case applies to this. I do want to mention that, you know, our three jury instruction issues, we think that if the Court doesn't buy our argument that Local 350 controls and that we're entitled to prevail, we think that we're entitled to a remand because of the jury instructions. And we think what the jury instructions did are they. . . Is this an abuse of discretion? It is. Under the Sanjvi case, because it distracts. . . The two instructions the judge gave, that we object to distract from the question of discrimination, fell nond. And in particular, the instruction about the pension plan, it injects into the case distracting concepts for the jury. And particularly what it does is requires the district to have a reason to re-employ these plaintiffs. And that's the inverse of what happens in a discrimination case. In a discrimination case, the employer must articulate a reason. And so it's confusing for the jury when you tell them, on the one hand, the district must have a reason that's in the public interest to re-employ these people. And on the other hand, say that they can discriminate if they don't have a reason. The second. . . But instruction 12 was pretty clear, wasn't it, in my read of it, that denying employment on the basis of age was impermissible. Instruction 12 is clear. And, of course, that's the whole reason. And it seemed to me that it not only said that, but it said if this is for age, decide for the plaintiff. Instruction 12 is a Ninth Circuit model rule. It is clear, and that's why there wasn't a need for instruction 4 and instruction 11. Then what question. . . I mean, I'm looking at the jury question, the answers, and I say the question the jury answered was this was not for age. Basically, if I look at instruction 12 and I presume the jury followed the instructions, there's no way they said it was anything that had to do with age. Yes, but we are entitled to instruction. I mean, we're in abuse of discretion now. Rejection of proposed instructions is an abuse of discretion. And they put in instruction 9, and there is a supplement to number 9, and there's 11, and there's 2. But when I go to 12, I'm just saying I think 12 was your jury instruction, and you lost. Sanji says that you don't inject summary judgment formats and burdens of proof into an instruction on discrimination. And, you know, if 12 was adequate and complete, 4 and 11 shouldn't have been given. 11 in particular. . . Tough argument on abuse of discretion. Well, then let me move to my last argument, Judge, which is we certainly were entitled to our theory of the case on third-party preferences. And there is Ninth Circuit authority that it's an abuse of discretion to fail to give that instruction if it's supported by the evidence. No one. . . This is a requested instruction, too. It is. No one disputes the accuracy of it as a question of law. I guess what we're trying to figure out there is, is it not covered? I don't see how it could be covered. I mean, if. . . I understand your argument. I'm just trying to hear it out. Well, I'd ask you to do more than that. I'm going to hear him out in a minute. I looked at Instruction 2, and I said that seems to be covered. I don't see how it is, because the Instruction 12 focuses on the employer's decision being motivated by age. This Instruction 12, too, what it says is if there's people outside the employer who are pressuring the employer for discriminatory reasons, that's a viable claim. And by focusing just on the employer's decision, for example, the employer can say, in this case, we were pressured to do this. We hired these folks before without regard to age, and the only reason we did this was we were pressured to do this. We're entitled to instruction that gives the jury the law regarding our argument. And that's what the Ninth Circuit has said. My time is up. I appreciate your consideration, Judge. Thank you. May it please the Court, Counsel. Brett Mercereau on behalf of Defendants of North Bosco School District. Before I start the rest of my argument, I want to address a couple of the points that Counsel made about Local 350. Local 350 is simply no longer good law. It was decided before Hays and Paper, before Kentucky Retirement Systems, and the principle articulated in Local 350 was specifically rejected by the Supreme Court in those two cases, the principle being pension status equals age. If you differentiate among people based on pension status, you are automatically differentiating between people based on age under Local 350. But the Supreme Court said the exact opposite in Hays and Paper and Kentucky Retirement, that you can sort people based on pension status without also sorting them based on age, as long as you are not using pension status as a proxy for age. In fact, in the footnote, Counsel argues that Local 350 found a violation. But if you look at the text of the footnote, which was written after Hays and Paper, after the Supreme Court had spoken, the Court says in the footnote, the violation alleged by the EEOC may also fall within Hays and's definition of disparate treatment. And it goes on to quote Hays and, and quote the standard saying, if you are actually motivated by age and not pension status, you have violated the ADEA. So the principle in Local 350 is simply not the law following those two Supreme Court cases. So does that say one has to determine then what the theories of the case are in order to determine whether to go on with what they're saying? Well, exactly. That is what it said. And in the very last sentence of the footnote, the Court said, the District Court should direct the EEOC to articulate its theory or theories of discrimination in accordance with Hays and. So, and I will say to the Court, there was no evidence that would suffice to sustain a disparate impact claim in this case. There was no argument to the jury on a disparate impact theory. This case has been disparate treatment from the beginning. It remains disparate treatment now. And we believe this Court should affirm the decision of a jury, of the appellant's peers reached after seven days of trial, finding no age discrimination in this case. On appeal, the appellants raised two categories of issues, as counsel argued. First, that the policy passed in 2008 by this school board was facially discriminatory. And second, a number of issues raised about jury instructions. On the first question, this policy simply was not facially discriminatory for the simple reason that it does not mandate age discrimination. The controlling authority in this case, or the two controlling authorities, Hazen Paper and Kentucky Retirement, provide that policies such as the one at issue are facially discriminatory if they require adverse treatment of employees with the protected trait. Here, the protected trait is age. This policy, which restricted PERS retirees from applying for certain jobs, not all jobs, but certain jobs, does not require adverse treatment of older workers. It requires adverse treatment of PERS retirees. And in fact, the evidence at trial before this jury was that older workers were hired at the same time that these plaintiffs applied and were not considered because of the policy. The appellants here are asking you to embrace the faulty logic that the Supreme Court specifically rejected in Hazen Paper and in Kentucky Retirement systems. That faulty logic is that pension status and age are the same thing. And if you think of the issue as a series of Venn diagrams, then the fault in the logic becomes clear. The circle containing those protected by the ADEA, i.e., everyone over 40, is much larger than the circle inside that larger circle, which contains all PERS retirees. Therefore, it's simply not logical to say that being a PERS retiree or treating people differently based on their retirement status is equivalent to treating someone differently based on their age. And in this particular case, this was my questioning to counsel, in this particular case, his arguments, or at least the arguments he's presenting to us, he also presented to the jury, and they determined quite opposite of 350. No, you're wrong. We're in 350. It was in summary judgment, right? That's exactly right. That's exactly right. The jury in this case answered the question that Hazen Paper asks, which is, when you have a policy that discriminates or differentiates based on pension status, is there a hidden motivation based on age? Is pension status a proxy for age? The jury in this case said no, it wasn't. And the evidence in the record demonstrated why that was, because older workers were hired at the same time that these plaintiffs were not, because the rationales articulated by the district could relate solely to pension status and not age, and so on. You're talking about workers who were age 40 and above? Correct. Those are protected by the ADA, Your Honor. Kentucky Retirement System says, as a matter of pure logic, age and pension status are analytically distinct, and that really is hard to argue with. Let me ask you one question which kind of concerns me in your argument. Can a retired employee elect to stop receiving his pension or her pension, his or her, and then be eligible for the positions that are not unusual or hard to fill? The answer to your question is probably yes, in most circumstances, but not in this circumstance. And here's why. Because of the way that PERS is set up, the so-called un-retire statute cannot apply to any retiree in a county that has less than 35,000 people, because the un-retire consequences, meaning you're taken out of PERS, depending on the timing you may have to repay some of the benefits you received, are only triggered when a retiree exceeds 1,040 hours of work in a given year. However, the statute says that that 1,040-hour limitation does not apply to retirees in counties of 35,000 or less. It may be possible, it's not in this record, Your Honor, but it may be possible that you can simply un-retire from PERS as a matter of an affirmative act not related to your employment. But the simple fact is, and this is why this argument by the plaintiffs holds no weight, there was never any evidence in this case that any of these plaintiffs wanted to un-retire, asked anyone if they could un-retire. And, in fact, each of them worked at least one year after they were retired for this district. So there simply is no indication that any of these plaintiffs wanted to un-retire, which would be the only reason that would make it relevant in this case. Briefly, on the jury instruction arguments, jury instruction number nine is simply a perfect, accurate, neutral recitation of the Oregon statutes that were important to this case, the PERS retirement statutes. The un-retire program, as I mentioned, was simply not relevant, and so it was not necessary to add a sentence or a separate instruction putting forth to the jury the provisions of that un-retire statute, which were not relevant. Jury instruction number 11 was a perfectly accurate, neutral recitation of the principles that the Supreme Court articulated in Hazen paper in Kentucky retirement. An appellant's requested extra sentence was incomplete. The inaccurate and stigmatizing stereotypes based on age is only one factor or one way that you can get to the conclusion that pension status is a proxy for age. Why did we need instruction number nine? Because of the fact that jury instruction number nine was necessary to explain to the jury why the 2008 policy even existed. This goes back to the Court's question about double-dipping. Double-dipping in the majority of Oregon or for the majority of Oregon workers is not permitted. No PERS retiree can work more than 1,040 hours in a year unless they're in a small county or unless they un-retire, and that information was part of the background of this case. It was necessary to explain to the jury why this school district could hire retirees in the first place. But doesn't, as your opponent has argued, doesn't that take away from the validity of what instruction 12 suggests? I don't believe so at all, Your Honor. Instruction 12 clearly told the jury that if this decision was made because of age and not pension status, the district had violated the ADEA. That is the law. The law and the jury was required to know that in order to come to the decision it did. The pension question simply explained to the jury why pension status was an issue in this case at all. If this case had arisen in Multnomah County, there would be no case because the school district could not hire these retirees, and there was a need to tell the jury the provisions of the Oregon statute, and it simply put them forward without any comment or spin at all. Well, it seems as if it was suggesting that the only reason we got a case here is because we're in a big county, and so, therefore, there's another reason for you to look at this case, and then we probably ought to have requested instruction number 2. Well, Your Honor, The hire of the retirees is part-time. Well, not for these particular jobs because they were full-time teaching jobs, Your Honor, but yes, retirees can work up to 1,040 hours. Part-time. That's intended to be about half-time, I believe. To respond to Your Honor's question, the cat's paw instruction was not necessary because it wasn't a legal instruction. It was more of a factual instruction, and the way I distinguish between the cases that the appellants have cited in support of their cat's paw instruction argument is In each of those cases, in Dang, in Galdemez, the court was wrong about the law. In Dang, the court thought that oppressive conduct could not lead to punitive damages. In Galdemez, the court thought that a hostile working environment couldn't be caused by customers. Both those conclusions or ideas about the law were wrong. Here, the court was exactly right about the law, and I'd like to refer to page 54 of the appellant's opening brief, which contains part of the transcript of the court's comments at this case, and what the court said when talking about this particular instruction was, he told us he was going to be looking for whether certain evidence appeared in the case. What I will be looking for is whether some other entity or group, either the community or the school officials, influenced the district to take action based on age discrimination, and I'm going to be separating that from influencing the school district to take action based on pension status. So, as appellant correctly argues, taking the district judge at his word, he must have concluded that the evidence was insufficient for those propositions. So, to the extent that the district judge is best situated to weigh evidence, to make credibility determinations, to look at the evidence as a whole and decide whether or not a jury instruction is appropriate, that's what he did here. And that decision was one that the district court makes in trial, and although he never explained it on the record, the only conclusion that we can draw is that he didn't find the evidence was sufficient for that theory. But, even throwing all of that out the window, Your Honor, at the end of the day, a cat's paw case is about age. Regardless of where the age discrimination comes from, the decision against the plaintiff in a cat's paw case is still because of that plaintiff's age. And jury instruction number 12 told the jury, if you find that the decision in this case was reached because of age, you find a violation. The jury found no violation and, therefore, must have concluded that the decision was not based on age, but rather pension status, as is legally permissible. Thank you. Thank you. If I may, Your Honor, I'd like to make two points, just very briefly. And those are these. There was questions about Local 350 and what the claim was in it, and I just want to read, very briefly, from page 646. The Ninth Circuit, analyzing section 623 of the ADEA, says, Under this analysis, Local 350's policy discriminates on the basis of age. On its face, it discriminates only against retired employees. However, only employees 55 or older are eligible to retire. That theory was presented clearly to, in our motion for judgment as a matter of law, before the case went to the jury, and was also clearly presented in the Ninth Circuit, and I think that it's preserved because of that. The second thing I do want to say is, we do think that the issue of the state statute giving retirees the ability to return to work is significant in this case because that's part of what the school district's policy precluded these folks from doing. The defendant argues there wasn't evidence that these people offered to forfeit their benefits,  What should occur in these kinds of situations is somebody should be free to apply and be considered. Once a determination is made that they're the most qualified, the district can, under the statute, say to them, We're not going to give you both a salary and take you out of the retirement system. We want you to forfeit your benefits. That's the way it should work in this particular kind of district. If the district wants to employ folks pursuant to ORS 238.078 and say that they're going to be outside the PERS system and they're going to be hired under that, they're free to make that decision. They're not free to tell folks you can't apply and be considered because that's the discriminatory portion of this thing. These folks were precluded from consideration from employment. And that's distinctly different from anything in Kentucky retirement systems. Thank you. They wanted to continue teaching while they retired? I'm sorry, Judge, I walked out on your question there. They wanted to continue teaching while they retired? The factual background on that is that the district had a policy which said, You can retire and continue working. And they had, for many years, allowed people to do that. And they gave them their say. They had their retirement and then they got their recession. Yeah. The distinction, though, is that had they continued working under their former contracts, their pensions would have increased. Contributions would have been made by the district and them to the pension fund. And when they ultimately retired, their pensions would have been significantly different. What this policy enabled both the teachers and district to do, they retire from the PERS program, they continue working, they get their salary, they get their pension, but it doesn't grow. They don't make contributions to the pension plan. The district doesn't either. The district saves money. And so the bargain, if you will, is that they get less pension benefits for the rest of their life and in exchange get a pension and salary until they ultimately decide to quit teaching. The district had that program. They did not retire. They get an increased pension. Exactly. Exactly. And they wouldn't get this under this district program, which said you can retire and continue working. And there was evidence at the trial that many of these people, you know, had no intent of leaving their employment and that they wrote to the board and told them, we don't intend to retire. We want to take advantage of this program. There was even evidence that the district recruited some folks to participate because it saved the district money. And that's why kind of after the district changed its mind, people were upset. Thank you. Thank you. The matter is submitted. We'll take a look at the last case this morning.
judges: Pregerson, Smith, Owens